## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ) | | |

**EMBLEMHEALTH, INC.,** *individually*    )
*and on behalf of all others similarly situated,*    )
                                            )
              **Plaintiff,**           )
                                            )           **Civil Action No.**
      **v.**                      )           **25-10985-BEM**
                                              )
**ALEXION PHARMACEUTICALS, INC.,**    )
**et al.,**                                    )
                                            )
            **Defendants.**        )

## MEMORANDUM AND ORDER ON
## <u>DEFENDANTS' MOTION TO DISMISS</u>

**MURPHY, J.**

Plaintiff EmblemHealth, Inc. ("Emblem") has brought this putative class action against Defendants Alexion Pharmaceuticals, Inc. and Alexion Pharma International Operations Ltd. (collectively, "Alexion" or "Defendants"), alleging that Alexion engaged in anti-competitive conduct in violation of the Sherman Act and various state antitrust laws, as well as violations of various state consumer protection and unjust enrichment laws, by enforcing fraudulently obtained patents for its drug, eculizumab, sold under the brand name Soliris. According to Emblem, Alexion's conduct caused end payers to overpay for Soliris for years. Before the Court now is Alexion's motion to dismiss the amended complaint pursuant to Federal Rule 12(b)(6). For the reasons stated below, the Court will grant, in part, Alexion's motion to dismiss.

## I.    Background

### A.    Factual Background

The following facts are drawn from Emblem's amended complaint, Dkt. 22 ("Compl." or the "Complaint") and are accepted as true for the purposes of resolving Alexion's motion to dismiss.[1]

#### 1.    Regulatory Background

##### a.    Drug Approvals

Under the Federal Food, Drug and Cosmetic Act ("FDCA"), manufacturers who create a new drug product must obtain approval of the Food and Drug Administration ("FDA") by filing a New Drug Application ("NDA").  Compl. ¶ 27.  Generally, the company that submitted an NDA will hold patent or regulatory exclusivity, preventing competition for some limited period.  *Id.*  In 1984, Congress passed the Hatch-Waxman Act to create a streamlined process for bringing generic drugs to market by permitting manufacturers of generic drugs to submit an Abbreviated New Drug Application ("ANDA"), which incorporates and relies on the scientific findings of safety and effectiveness established by the brand name drug's original NDA.  *Id.* ¶ 28.

Under the Biologics Price Competition and Innovation Act ("BPCIA"), manufacturers who create a new biologic drug must obtain approval of the FDA by filing a Biologic License Application ("BLA").  *Id.* ¶ 29.  A BLA must demonstrate that the biologic is "safe, pure, and potent."  *Id.* (quoting 42 U.S.C. § 262(a)(2)(C)(i)(I)).  The BPCIA also provides an abbreviated FDA-approval process through an abbreviated BLA ("aBLA") for biosimilar drugs, which are based on copies of biologics, known as biosimilars, which, while having no clinically meaningful differences in safety, purity, or potency as compared to their reference biologics, are not identical

---

[1] The amended complaint is 180 pages and consists of 882 paragraphs.  Accordingly, the Court provides only an abbreviated overview here, with additional facts included in the analysis as needed.

to the reference biologics. *Id.* ¶¶ 30–32. Approval of an aBLA requires demonstrating that the proposed biosimilar is "highly similar" to the reference product and that there are no "clinically meaningful differences" between the two in terms of "safety, purity, and potency." *Id.* ¶ 32 (quoting 42 U.S.C. § 262(i)(2)). The BPCIA sets out a statutory monopoly for a new biologic drug: a biosimilar manufacturer may not submit an aBLA until four years after the reference product is first licensed, and an aBLA may not be approved until twelve years after the reference product is first licensed. *Id.* ¶ 33 (citing 42 U.S.C. § 262(k)(7)).

An aBLA applicant must provide the patent holder at least 180-days' notice before commercially marketing its biosimilar. *Id.* ¶ 67 (citing 42 U.S.C. § 262(l)(8)(A)). After the notice period expires and the FDA has approved the aBLA, the aBLA applicant may launch its biosimilar, regardless of the existence or status of any patent litigation. *Id.* ¶ 68.

### b.    Scrutiny of Patent

In addition to the statutory monopoly provided under the BPCIA, a manufacturer can hold patents that constrain an aBLA applicant's ability to market its biosimilar. *Id.* ¶ 44. Federal regulations dictate strict disclosure obligations for patent applicants, requiring that applicants disclose to patent examiners "all information known to be material to patentability," including any prior art. *Id.* ¶ 47 (quoting 37 C.F.R. § 1.56(a)). Prior art includes prior patents, publications, and other publicly known material before the filing date of the patent. *Id.* ¶ 45.

Any member of the public can challenge a patent through the *inter partes* review ("IPR") system, during which a panel of administrative law judges belonging to the Patent Trial and Appeals Board ("PTAB") reviews the patent at issue. *Id.* ¶¶ 54–55. Review through the IPR system is limited to challenges to the validity of a patent based on obviousness or anticipation. *Id.* ¶ 55. In order for the PTAB to grant review of a patent, the challenger must show "a reasonable

likelihood that the petitioner would prevail with respect to at least [one] of the claims challenged in the petition." *Id.* ¶ 56 (quoting 35 U.S.C. § 314(a)).

If a patent holder believes that another person or entity is violating its patent, the patent holder may initiate patent litigation to protect its patent rights. *Id.* ¶ 67. Both the Hatch-Waxman Act and the BPCIA enable a patent holder to bring an infringement action prior to the launch of a biosimilar product. *Id.* ¶¶ 62–67. A party can avoid liability for patent infringement by demonstrating that the patent is invalid or unenforceable. *Id.* ¶ 58.

### 2.    Alexion's Drug, Soliris

Alexion developed the anti-C5 antibody eculizumab by 1995 and sought a patent on it and other anti-C5 antibodies. *Id.* ¶¶ 102, 109. On March 12, 2002, the U.S. Patent and Trademark Office ("PTO") issued Alexion a composition patent as U.S. Patent No. 6,355,245 ("the '245 patent").[2] *Id.* ¶ 110. This patent claims eculizumab, a biologic pharmaceutical comprising an anti-C5 antibody having a specified sequence of heavy and light chains. *Id.* ¶¶ 111–12. The '245 patent protected eculizumab from biosimilar competition for 17 years, until March 12, 2019. *Id.* ¶ 113.

In March 2007, the FDA approved Alexion's application to market Soliris—the brand name for eculizumab—for the treatment of paroxysmal nocturnal hemoglobinuria ("PNH"). *Id.* ¶ 133. Also in March 2007, Alexion sought additional patent protections for eculizumab for the treatment of PNH.[3] *Id.* ¶ 132. In May 2007, Alexion told the PTO that the patent claimed Soliris and asked that the PTO extend expiration by two years (until March 16, 2027) to account for FDA review time. *Id.* ¶¶ 134–35, 137. The PTO did so. *Id.* ¶ 145. Soliris costs upwards of $500,000

---

[2] Ten Alexion employees were listed as inventors. *Id.* ¶ 110.

[3] Soliris was later approved to also treat atypical hemolytic uremic syndrome ("aHUS"), generalized myasthenia gravis ("gMG"), and neuromyelitis optica spectrum disorder ("NMOSD"). *Id.* ¶ 93.

per patient, per year. *Id.* ¶¶ 3, 155. As of 2021, Alexion had made over $10 billion from U.S. Soliris sales. *Id.* ¶¶ 3, 150, 250.

By 2016, Alexion recognized that they would face competition when the patent for Soliris expired. *Id.* ¶¶ 168–69, 295. Between 2016 and 2020, Alexion sought and eventually obtained five additional patents covering Soliris: U.S. Patent No. 9,718,880 ("the '880 patent"), U.S. Patent No. 9,725,504 ("the '504 patent"), and U.S. Patent No. 9,732,149 ("the '149 patent") (collectively, "the 2017 Patents");[4] U.S. Patent No. 10,590,189 ("the '189 patent") and U.S. Patent No. 10,703,809 ("the '809 patent") (collectively, "the 2020 Patents"). *Id.* ¶¶ 172, 174–75, 194–97, 222–23, 228. The 2017 Patents and 2020 Patents expire between March 15 and September 8, 2027. *Id.* ¶ 170. Initially, the patent examiner rejected the claims for each patent but later allowed the applications after additional information from Alexion and their patent attorney, which Emblem alleges contained misrepresentations and incomplete disclosures to the patent examiner sufficient to constitute fraud. *Id.* ¶¶ 173, 176–92, 194–97, 210–41.

### 3.    Patent Disputes and Settlements

#### a.    Amgen Dispute

Around mid-2016, a biosimilar manufacturer, Amgen, publicly announced it was developing an eculizumab biosimilar. *Id.* ¶¶ 164–65. By October 2018, Amgen began conducting a Phase 3 pivotal study of its biosimilar. *Id.* ¶ 199. Analysts projected that Amgen would be able to launch its biosimilar by 2022. *Id.* ¶ 244.

In February 2019, Amgen challenged the 2017 Patents in IPR proceedings. *Id.* ¶ 207. The PTAB instituted review of the patents, which Amgen alleges means that the PTAB found it reasonably likely that at least one claim of each patent was invalid. *Id.* ¶ 208. On May 28, 2020,

---

[4] These patents were assigned to Alexion. *Id.* ¶¶ 172, 174–75.

Amgen and Alexion announced a settlement resolving the IPRs, shortly before the scheduled final oral argument in front of the PTAB. *Id.* ¶ 246. As a result, the PTAB never made a final determination on the validity of Alexion's 2017 Patents. *Id.* The settlement required Amgen to delay marketing of its biosimilar eculizumab product until March 1, 2025—approximately two years earlier than the 2017 Patents permitted. *Id.* ¶¶ 170, 247. On May 28, 2024, Amgen received FDA approval to market its Soliris biosimilar product. *Id.* ¶¶ 84, 283. Amgen launched its Soliris biosimilar in March 2025. *Id.* ¶¶ 170, 288.

### b.    Samsung Dispute

By November 2018, another biosimilar manufacturer, Samsung Bioepis ("Samsung"), had begun clinical trials of its own eculizumab biosimilar. *Id.* ¶ 200. In August 2019, Samsung announced that it had initiated a Phase III study of its eculizumab biosimilar. *Id.* ¶ 256. This study was completed in October 2021. *Id.*

In June 2023, Samsung challenged the 2017 Patents and the 2020 Patents in IPR proceedings. *Id.* ¶ 257. In December 2023, the PTAB instituted review of all five of the challenged patents, finding that Samsung demonstrated a reasonable likelihood of prevailing on at least one of its invalidity arguments for each patent. *Id.* ¶¶ 257–262. The IPRs were synchronized, with briefing to conclude by summer 2024 and oral arguments scheduled for September 17, 2024. *Id.* ¶¶ 263, 285.

Around July 2023, Samsung submitted an aBLA to the FDA for approval to market a biosimilar version of Soliris. *Id.* ¶ 264. In July 2023, pursuant to the BPCIA notification requirements, Samsung notified Alexion that it intended to launch its Soliris biosimilar after January 3, 2024, after the 180-day waiting period. *Id.* ¶ 265. On July 19, 2024, Samsung received FDA approval to market its Soliris biosimilar product. *Id.* ¶¶ 84, 284.

While the FDA's review was ongoing, on January 3, 2024, Alexion filed a patent infringement suit against Samsung. *Id.* ¶ 266. During this litigation, Alexion sought an injunction or temporary restraining order to prevent Samsung from launching its biosimilar while the case was ongoing, which was denied. *Id.* ¶¶ 279–80, 282. On August 30, 2024, Samsung and Alexion settled all pending claims involving Soliris, including the patent litigation and all pending IPRs. Samsung launched its Soliris biosimilar product in April 2025. *Id.* ¶¶ 170, 289.

### 4.    **Emblem**

Emblem is a health insurer that has purchased and continues to purchase Soliris for its members through third-party pharmacies at which Emblem's health plan members have prescriptions filled. *Id.* ¶¶ 11–13. Emblem alleges that it and other end-payor purchasers have been forced to pay higher prices for Soliris because Alexion unlawfully prevented biosimilars from entering the market since at least March 2022. *Id.* ¶¶ 288–89, 291–92.

### B.    **Procedural Background**

On April 16, 2025, Emblem filed its initial complaint alleging various antitrust violations against Alexion. Dkt. 1. On June 24, 2025, Emblem filed an amended complaint, asserting claims for monopolization and monopolistic scheme under Section 2 of the Sherman Act and state law (Counts 1 and 3), Compl. ¶¶ 355–69, 380–98; attempted monopolization under Section 2 of the Sherman Act and state law (Counts 2 and 4), *id.* ¶¶ 370–79, 399–416; violations of state consumer protection laws (Count 5), *id.* ¶¶ 417–658; and unjust enrichment (Count 6), *id.* ¶¶ 659–882. On August 5, 2025, Alexion moved under Rule 12(b)(6) to dismiss the claims against them. Dkt. 27; *see also* Dkt. 28 ("Mem."). On September 11, 2025, Emblem opposed. Dkt. 36 ("Opp."). With leave, Alexion filed a reply on September 26, 2025. Dkt. 39 ("Reply"). The Court heard oral arguments on November 17, 2025, and took the matter under advisement.

## II.    <u>Standard of Review</u>

### A.    <u>12(b)(1)</u>

"When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first."[5] *Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011), *aff'd*, 672 F.3d 64 (1st Cir. 2012). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010) (citing *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)). The Court, however, may also look beyond the pleadings to any evidentiary materials submitted by the parties to determine whether it has jurisdiction. *Martínez-Rivera v. Puerto Rico*, 812 F.3d 69, 74 (1st Cir. 2016).

### B.    <u>12(b)(6)</u>

Courts analyzing claims under Federal Rule 12(b)(6) must determine whether a plaintiff's factual allegations—disregarding all "conclusory" statements—"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage, plaintiffs need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *García-Catalán v. United States*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "The inquiry is usually limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice," *Whelden v. U.S. Bank Nat'l Ass'n*, 494 F. Supp. 3d 68, 73 (D. Mass. 2020) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)), "but the court may also consider

---

[5] While the parties make no reference to Rule 12(b)(1), Alexion challenges Emblem's Article III standing, *see* Mem. at 27, which is a jurisdictional challenge under Rule 12(b)(1). *See Reddy v. Foster,* 845 F.3d 493, 500 (1st Cir. 2017) (describing standing as a jurisdictional requirement under Article III).

other documents the authenticity of which is not disputed by the parties, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint," *id.* (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

## III. <u>Jurisdiction</u>

Alexion argues that "Emblem . . . lacks Article III standing to assert these claims under the laws of any state where it neither resides nor alleges that it reimbursed patients for Soliris." Mem. at 27 (relying on the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Emblem contends that *TransUnion* does not overturn the First Circuit's decision in *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018). Emblem argues that "a class representative has standing to pursue claims by proposed class members under state laws materially identical to those under which its own claims arise." Opp. at 32–33 (citing *In re Asacol*, 907 F.3d at 47–51).

In *Asacol*, "[t]he First Circuit rejected the defendant's Article III standing challenge to the inclusion of unnamed plaintiffs who made purchases outside the states where the named plaintiffs made purchases." *Morales Posada v. Cultural Care, Inc.*, 554 F. Supp. 3d 309, 324 (D. Mass. 2021) (citing *Asacol*, 907 F.3d at 47–51), *aff'd on other grounds sub nom. Posada v. Cultural Care, Inc.*, 66 F.4th 348 (1st Cir. 2023). "The court rejected the standing challenge because it was convinced the named plaintiffs would adequately protect the interests of unnamed plaintiffs, and it was convinced because of the parallelism of the state laws." *Id.* (citing *Asacol*, 907 F.3d at 49–50).

A few years later, in *TransUnion*, the Supreme Court held that "[p]laintiffs 'must demonstrate standing for each claim that they press and for each form of relief that they seek'" and "concluded that only a portion of the certified class in that case had standing to pursue the claim that [defendant] had failed to use reasonable procedures in maintaining its credit files." *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (quoting *TransUnion*, 594 U.S.

at 431). This is because "the remaining 6,332 class members whose credit reports were not disseminated to third parties" had suffered no "concrete injury," nor had they "demonstrated that they 'were independently harmed by their exposure to the risk—that is, that they suffered some other injury . . . from the mere risk that their credit reports would be provided to third-party businesses.'" *Id.* (quoting *TransUnion*, 594 U.S. at 437).

As an initial matter, Alexion has not identified any authority for their contention that *TransUnion* overruled *Asacol*.[6] *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed."). But more importantly, "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004) (citing *Sarzen v. Gaughan*, 489 F.2d 1076, 1082 (1st Cir. 1973) (explaining that stare decisis requires lower courts to take binding pronouncements "at face value until formally altered")), *abrogation on other grounds recognized by Carson as Next Friend of O.C. v. Makin*, 596 U.S. 767 (2022); *see also Cox v. City of Bos.*, 2024 WL 4608587, at *2 (D. Mass. Oct. 29, 2024) ("[I]n the absence of a squarely binding Supreme Court decision mandating a divergence, it is not within the authority of a district court to blaze trails contrary to existing First Circuit precedent."). The Court cannot conclude that *TransUnion* overruled *Asacol*. Holding that a party with *no* concrete injury has no standing does not address whether a party that

---

[6] The only case Alexion cites on this point is *Premera Blue Cross v. Takeda Pharmaceutical Co. Ltd.*, 2023 WL 9474011 (D. Mass. Nov. 20, 2023). Mem. at 28. The Court in *Premera* did not consider whether the plaintiff had standing to sue on behalf of a class comprised of members in states for which the named plaintiff had suffered no harm because the court held that the plaintiff had no viable claim in *any* state. *Premera*, 2023 WL 9474011, at *7 ("A named plaintiff that does not state any viable claim, naturally lacks the incentive needed to adequately litigate claims on behalf of a class." (citing *Asacol*, 907 F.3d at 48–49)). Here, Alexion concedes that, should their arguments regarding the federal antitrust claims fail, Emblem has Article III standing "to pursu[e] state law claims . . . for the nine states where it allegedly reimbursed for Soliris." Reply at 16.

*does* have standing in several states may represent a class of plaintiffs that each would have standing in the remaining states for the same general claims. Later First Circuit cases considering the standing of class representatives asserting nationwide classes have raised no issue of conflict between *TransUnion* and *Asacol*. *See, e.g.*, *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 35–38 (1st Cir. 2022) (addressing arguments regarding named plaintiffs' standing, citing to both *TransUnion* and *Asacol* without raising any concerns that *Asacol* had been overruled).[7]

As such, the Court concludes that *TransUnion* does not bar Emblem's standing to assert claims on behalf of a nationwide class, even in states where Emblem itself suffered no harm.[8] Thus, for substantially the reasons stated in Emblem's opposition, *see* Opp. at 32–34, Emblem has standing as class representative to pursue state law claims by proposed class members.

## IV.    **Merits**

Alexion moves to dismiss the amended complaint on several bases: (1) that Emblem has failed to plead an antitrust injury, Mem. at 20–22; (2) that Emblem has no standing to assert a *Walker Process* claim,[9] *id.* at 22–24; (3) that Emblem has failed to allege plausibly that Alexion

---

[7] While normally the Court would draw no conclusion from a court's lack of analysis on an issue, "federal courts are required *sua sponte* to examine jurisdictional issues such as standing." *B.C. v. Plumas Unified School Dist.*, 192 F.3d 1260, 1264 (1st Cir. 1999); *see also Spooner v. EEN, Inc.*, 644 F.3d 62, 67 (1st Cir. 2011) ("A court is duty-bound to notice, and act upon, defects in its subject matter jurisdiction sua sponte." (citing *McCulloch v. Vélez*, 364 F.3d 1, 5 (1st Cir. 2004)).

[8] Alexion makes no argument that Emblem fails to satisfy the standing requirements laid out in *Asacol*. Regardless, the Court finds that Emblem meets the requirements under *Asacol* sufficient to demonstrate standing as class representative to pursue state law claims by proposed class members.

[9] This theory arises out of the Supreme Court's decision in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 389 U.S. 172, 174 (1965).

engaged in sham litigation, *id.* at 16–19; and (4) that Emblem has failed to plead its state law claims, *id.* at 26–28.[10] The Court address each argument in turn below.

### A.    The Sherman Act

Emblem alleges that Alexion violated Section 2 of the Sherman Act ("Section 2") through unlawful monopolization and attempted unlawful monopolization. Compl. ¶¶ 355–79. Section 2 imposes liability upon "every person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To establish a Section 2 monopolization claim, a plaintiff must show "(1) that the defendant possesses monopoly power in the relevant market, and (2) that the defendant has acquired or maintained that power by improper means." *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 7 (1st Cir. 2020) (quoting *Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990)). "Attempted monopolization under § 2 of the Sherman Act requires proof of (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed." *Bos. Sci. Corp. v. Schneider (Europe) AG*, 983 F. Supp. 245, 268 (D. Mass. 1997).

Alexion argues that Emblem's antitrust claims should be dismissed because Emblem fails to plead antitrust standing and because Alexion's actions protecting their patent rights are entitled to *Noerr-Pennington* immunity.[11] Mem. at 15–24; Reply at 6–16. In antitrust cases, "plaintiffs must not only meet the typical requirements of Article III standing but also the requirements of the

---

[10] Alexion raises additional arguments—that the Amgen or Samsung settlements are not "independent violations" of the antitrust laws, that the settlements are not impermissible "reverse payments," that the Amgen dispute does not constitute sham litigation, and that Alexion did not engage in "product hopping," Reply at 5—that Emblem does not oppose because "the complaint [does not] allege" these claims. Opp. at 24 & n.42. Thus, the Court need not analyze these arguments. *See, e.g.*, *Concepcion v. Municipality of Gurabo*, 558 F. Supp. 2d 149, 159 (D.P.R. 2007) ("As Plaintiffs themselves acknowledge, since the Complaint does not assert a conspiracy claim, there is none to dismiss.").

[11] The *Noerr-Pennington* immunity doctrine comes from the Supreme Court's decisions in *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) and *Eastern. Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

so-called 'antitrust standing' doctrine."[12]  *Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286,

293 (1st Cir. 2022).  Additionally, under the *Noerr-Pennington* doctrine, "[a] party petitioning the

government for redress is 'generally immune from antitrust liability.'"  *Iron Workers Dist. Council*

*of New England Health & Welfare Fund v. Teva Pharm. Indus. Ltd.* ("*Iron Workers I*"), 734

F. Supp. 3d 145, 159 (D. Mass. 2024) (quoting *Prof'l Real Estate Invs., Inc. v. Columbia Pictures*

*Indus., Inc.* ("*PRE*"), 508 U.S. 49, 56 (1993)).  This immunity is grounded in the First Amendment

right to petition the government.  *United Food & Com. Workers Unions & Emps. Midwest Health*

*Benefits Fund v. Novartis Pharms. Corp.* ("*United Food II*"), 902 F.3d 1, 4–5 (1st Cir. 2018).

*Noerr-Pennington* immunity has two exceptions: "sham" litigation and *Walker Process* fraud.  *Id.*

at 5.  Alexion argues that Emblem has failed to plausibly allege that either exception applies.

### 1.    Antitrust Standing

To have antitrust standing, a plaintiff must have "suffered an injury of the kind antitrust

laws were intended to prevent, such that Plaintiff is a proper party to bring a federal antitrust suit."

*Id.*  Courts use a six-factor test to determine whether a plaintiff has standing to bring an antitrust

action:

> (1) the causal connection between the alleged antitrust violation and harm to the
> plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and
> whether the injury was of a type that Congress sought to redress with the antitrust
> laws ("antitrust injury"); (4) the directness with which the alleged market restraint
> caused the asserted injury; (5) the speculative nature of the damages; and (6) the
> risk of duplicative recovery or complex apportionment of damages.

---

[12] Antitrust standing is treated as a substantive element of an antitrust claim and so is assessed, at this stage,
under Rule 12(b)(6).  *See, e.g.*, *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 72–73 (1st Cir. 2005).
Alexion has not challenged Emblem's Article III standing, and it appears that Emblem has constitutional standing to
bring this suit.  *Cf. Walker v. Analog Devices, Inc.*, 2023 WL 5353764 (D. Mass. Aug. 4, 2023) (declining to engage
in a comprehensive constitutional standing analysis in the antitrust context where the defendant had not contested the
issue and where there appeared to be "no issue in that regard").

*RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 14 (1st Cir. 2001) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)).

### a.        **Antitrust Injury**

The First Circuit "has emphasized the causation requirements of [the antitrust standing] test." *Id.*  "[E]ven though the third factor does not expressly reference causation, the Supreme Court has defined 'antitrust injury' as 'injury of the type the antitrust laws were intended to prevent and that *flows from that which makes the defendants' acts unlawful.*'"  *MJ's Mkt., Inc. v. Jushi Holdings, Inc.*, 766 F. Supp. 3d 197, 210 (D. Mass. 2025) (emphasis in original) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

"Plaintiffs bear the burden of proving an antitrust injury." *Id.* (citing *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011)).  "Plaintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause *to competition*." *Sterling Merch*, 656 F.3d at 121 (emphasis in original).  A plaintiff "need not prove that that the antitrust violation was the sole cause of their injury, but only that it was a material cause." *In re Nexium (Esomeprazole) Antitrust Litig.* ("*Nexium I*"), 42 F. Supp. 3d 231, 267 (D. Mass. 2014) (quoting *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 14 (1st Cir. 1979)), *aff'd*, 842 F.3d 34 (1st Cir. 2016).

Alexion argues that Emblem's antitrust claims should be dismissed because Emblem fails to plead facts that demonstrate antitrust injury.[13]  Mem. at 20.  Specifically, Alexion contends that Emblem's theory of harm—that Alexion caused a delay in biosimilar entry for Soliris—fails to

---

[13] Alexion only argues that Emblem lacks antitrust standing for failure to plead an antitrust injury.  Alexion's "failure to raise any arguments relative to [the other five] factors that the Court must consider means that those arguments are deemed waived since the lack of antitrust standing does not implicate the subject matter jurisdiction of this Court." *MJ's Mkt.*, 766 F. Supp. 3d at 211 (collecting cases).

plausibly plead that Alexion caused the delay because Amgen and Samsung could not have entered the market in 2022, since neither competitor had received FDA approval for their biosimilar at that time. *Id.* at 20–21.

The Court need not resolve at this stage of litigation whether Amgen and Samsung could have entered the market in 2022 but for Alexion's conduct. The Complaint clearly alleges that each competitor had received FDA approval to market their biosimilar drug during 2024, but did not enter the market until 2025 due to their respective settlements with Alexion. Compl. ¶¶ 84, 288–89.[14] That approximately one year of delay after receiving FDA approval due to the settlements with Alexion suffices for antitrust standing.[15] *See, e.g.*, *Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms., Inc.*, 783 F. Supp. 3d 417, 437–40 (D. Mass. 2025) (holding that FDA approval not outcome determinative of whether generic competitor had "intent and preparedness" to enter the market); *cf. In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *9 (D. Mass. Sept. 16, 2015) (holding no antitrust injury pled where generic competitor did not receive FDA approval until after entry date provided for under settlement agreement and complaint lacked allegation that defendants' conduct delayed FDA approval). Notably, Alexion does not attempt to argue that the delay in their competitors' market entry from 2024 to 2025 was not caused by Alexion's own conduct. *See* Mem. at 20–21 (arguing only that the lack of FDA approval in 2022 severed the causal link); Reply at 14–16 (same).

---

[14] Specifically, Emblem alleges that Amgen obtained FDA approval in May 2024, but did not launch its biosimilar until March 2025, and that Samsung obtained FDA approval in July 2024, but did not launch its biosimilar until April 2025.

[15] As such, the Court need not resolve whether Emblem has plausibly alleged "a link between the FDA's delay in approving" the biosimilar drugs prior to 2024 and Alexion's alleged anticompetitive conduct. *See* Opp. at 30–31.

b.    ***Walker Process* Standing**

Alexion also argues that Emblem lacks antitrust standing to pursue *Walker Process* claims.[16]  Mem. at 22.  Under *Walker Process*, the *Noerr-Pennington* doctrine does not afford immunity to a party's enforcement of a fraudulently obtained patent.  *Walker Process*, 382 U.S. at 174, 177.  Typically, *Walker Process* claims are brought as counterclaims in patent infringement lawsuits.  *See, e.g.*, *In re DDAVP*, 585 F.3d 677, 689–90 (2d Cir. 2009) ("*Walker Process* claims are based on a fraudulently obtained patent, and are typically brought as counterclaims in patent infringement suits: the plaintiff claims the defendant infringed his patent, and the defendant responds that the patent was invalid as fraudulently obtained, and that the plaintiff's enforcement efforts violate *Walker Process*.").

The parties dispute whether an indirect purchaser like Emblem has antitrust standing to allege *Walker Process* theories.  The First Circuit has not determined whether indirect purchasers of patented products have antitrust standing to assert a *Walker Process* claim.  That said, as far as this Court has found, and as far as the parties have identified, the only court to have found that indirect purchasers have standing to bring a *Walker Process* fraud claim distinguished between actions seeking injunctive relief as opposed to monetary damages—an approach that no other court has taken.  *See Carefirst of Md., Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288, 307–08 (E.D. Va. 2024) (finding indirect purchasers have standing, but recognizing that "no court has explicitly found that indirect purchasers have standing to bring a *Walker Process* fraud claim").  Instead, the Court finds persuasive the reasoning laid out in *Louisiana Health*, that:

---

[16] While referred to as "*Walker Process* standing," courts analyze standing under *Walker Process* as an issue of antitrust standing, not Article III standing.  *See, e.g.*, *In re DDAVP*, 585 F.3d 677, 689–90 (2d Cir. 2009).

> [Indirect purchasers'] injuries are derivative and too remote; there are more efficient alternate enforcers, such as the generics; [indirect purchasers'] theory of indirect injury necessarily involves intermediaries and intervening factors creating an "accompanying uncertainty" and "requir[ing] the court to speculate" about how each intermediary would have behaved had none of the patents issued; and the requested relief exacerbates manageability issues without providing any clear benefit.

*La. Health Serv. & Indem. Co. v. Celgene Corp.*, 2025 WL 1056668, at *19 (S.D.N.Y. Apr. 8, 2025) (final alteration in original).

Further, this approach comports with the First Circuit's approach to assessing whether a plaintiff is the proper party to assert antitrust claims. *See Serpa*, 199 F.3d at 10 ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." (citing *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 45 (1st Cir. 1995))); *SAS*, 48 F.3d at 45 ("[O]ne of the reasons for limiting standing concerns the speculative character of either the injury or the relationship between the violation and injury."). The alleged fraud on the PTO is too far removed from Emblem's injuries, with too many intervening intermediaries.[17] The majority of courts to consider the issue have reached the same conclusion, either directly or in dicta. *See, e.g.*, *In re Humira Antitrust Litig.*, 465 F. Supp. 3d 811, 831 n.11 (N.D. Ill. 2020) ("[T]he complaint does not assert a *Walker Process* claim . . . likely because these [indirect purchaser] plaintiffs would lack standing to do so." (citations omitted)), *aff'd sub. nom. Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709, 713 (7th Cir. Aug. 1, 2022) ("[I]t is far

---

[17] That the starting point of a *Walker Process* claim is alleged fraud on the PTO distinguishes the standing analysis for indirect purchasers from those cases that determined indirect purchasers had standing to challenge an allegedly anticompetitive reverse payment settlement, as the fraud on the PTO is even more removed than the settlement from the injuries Emblem alleges. *Cf. In re Amitiza Antitrust Litig.*, 2024 WL 4250224, at *11 (D. Mass. Aug. 21, 2024), *report and recommendation adopted as modified*, 2024 WL 4344887 (D. Mass. Sept. 30, 2024) (finding that end payor plaintiffs had antitrust standing "because of the prescription drug manufacturers' alleged anticompetitive conduct" in the form of an allegedly unlawful reverse payment settlement). For the same reason, this does not undermine those states that have allowed indirect purchasers to generally pursue federal antitrust damages claims.

from clear that payors would have standing to make such an argument."); *Farag v. Health Care Serv. Corp.*, 2017 WL 2868999, at *5 (N.D. Ill. July 5, 2017) ("Plaintiffs are indirect purchasers with respect to Novartis, and courts confronted with such situations decline to find *Walker Process* standing."); *In re K-Dur Antitrust Litig.*, 2007 WL 5297755, at *18–19 (D.N.J. Mar. 1, 2007) ("If this Court were to conclude that *indirect* purchasers had standing to bring *Walker Process* claims, it would turn antitrust policy on its head, and extend antitrust standing to an extraordinary level . . . [and] as compared to competitors and direct purchasers, indirect purchasers have certainly been *less* 'directly harmed.'" (emphases in original));[18] *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 547–48 (E.D.N.Y. 2005) (granting motion to dismiss *Walker Process* claims raised by indirect purchasers on preemption grounds and expressing doubt that indirect purchasers could have standing).[19]

---

[18] Emblem suggests that *K-Dur* "predate[s] the Third Circuit reinstating end payers' *Walker Process* claims in *Lipitor*." Opp. at 23. However, the Third Circuit in *Lipitor* did not address the issue of antitrust standing, let alone whether indirect purchasers have *Walker Process* standing. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 271–72 (3d Cir. 2017). As such, the case provides little, if any, support for Emblem's position. *See La. Health*, 2025 WL 1056668, at *19 n.48 ("The Court finds that these cases, having not explicitly addressed the issue of antitrust standing, do not support finding standing here."). For the same reason, the Court draws no conclusion from the other cases cited by Emblem in which courts did not address indirect purchasers' *Walker Process* standing. *Cf. MJ's Mkt.*, 766 F. Supp. 3d at 211 (collecting cases) (noting that, because "the lack of antitrust standing does not implicate . . . subject matter jurisdiction," arguments regarding antitrust standing are waivable).

[19] Alexion argues that *Walker Process* standing is limited to only competitors. Mem. at 23. Some courts have limited *Walker Process* standing by qualifying when direct purchasers have standing. *See, e.g.*, *DDAVP*, 585 F.3d at 689 (holding that direct "purchaser plaintiffs have standing to raise *Walker Process* claims for patents that are already unenforceable due to inequitable conduct" and "declin[ing] to decide whether [direct] purchaser plaintiffs *per se* have standing to raise *Walker Process* claims"); *Kroger Co. v. Sanofi–Aventis*, 701 F. Supp. 2d 938, 963 (S.D. Ohio 2010) ("The Court is loathe to grant such an expansion of potential patent challengers by conferring standing to direct purchasers of a drug for which the patent has been judicially determined to be valid and enforceable."). However, having concluded that indirect purchasers lack *Walker Process* standing, the Court need not determine whether a direct purchaser would have standing.

2.     **Sham Litigation**

Independent of *Walker Process*, Emblem separately contends that Alexion's patent infringement suit against Samsung was "sham litigation" that is not entitled to *Noerr-Pennington* protection.[20] *See, e.g.*, Opp. at 23–28.

The protection afforded by the *Noerr-Pennington* doctrine "does not . . . cover 'sham' activities or lawsuits." *Iron Workers I*, 734 F. Supp. 3d at 159 (citing *PRE*, 508 U.S. at 56). To assess whether a lawsuit is a sham, the Court considers whether the lawsuit is (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "conceals 'an attempt to interfere *directly* with the business relationships of a competitor' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *United Food II*, 902 F.3d at 13 (emphasis in original) (citation omitted). To prevail, "a plaintiff must allege that both prongs of the test are met." *Id.*

"An objectively reasonable patent suit is not a 'sham' within the meaning of the exception to *Noerr-Pennington* immunity, even if the litigant has a subjective intent to monopolize." *Nuance Comm'ns, Inc. v. Omilia Nat. Language Sols., Ltd.*, 2020 WL 2198362, at *5 (D. Mass. May 6, 2020) (quoting *PRE*, 508 U.S. at 57). The "objectively baseless" standard is analogized to the concept of "probable cause, as understood and applied in the commonlaw tort of wrongful civil proceedings." *PRE*, 508 U.S. at 62. "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 62–63 (cleaned up). "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." *Id.* at

---

[20] Emblem does not allege a sham litigation exception as to Alexion's conduct in defending the IPR process initiated by Amgen. Opp. at 24.

62.[21]  "[A]llegations [that] merely demonstrate that [the patentee] would have been subject to a serious defense to its infringement litigation" cannot clear this hurdle on a motion to dismiss. *United Food II*, 902 F.3d at 15.  Nor does a patentee's loss in the underlying litigation demonstrate that the case was objectively unreasonable.  *See PRE*, 508 U.S. at 60 n.5 ("[W]hen the antitrust defendant has lost the underlying litigation, a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'" (quoting *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 421–422 (1978))).

However, "[t]he *Noerr-Pennington* doctrine functions as an affirmative defense."  *MJ's Market*, 766 F. Supp. 3d at 213.  As such, "many other federal courts have concluded the *Noerr-Pennington* defense is typically only properly analyzed through a consideration of evidence outside of the pleadings and as such, [is usually] not appropriately considered in [a] Rule 12(b)(6) context."  *Id.* at 214 (alterations in original) (quoting *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, 2017 WL 2266993, at *6 (S.D. Tex. Apr. 24, 2017)) (collecting cases).  Thus, the question is whether Emblem has "ple[d] itself out of court—that is, admits all the ingredients of an impenetrable defense."  *Constr. Cost Data*, 2017 WL 2266993, at *6.[22]

---

[21] Alexion does not argue that Emblem has failed to adequately plead the second prong—whether the suit "conceal[ed] an attempt to interfere directly with a competitor's business," *PRE*, 508 U.S. at 60 (citing *Noerr*, 365 U.S. at 144)—and so the Court assesses only whether Emblem has plausibly alleged that the lawsuit against Samsung was objectively baseless, *see, e.g.*, *Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 149 (1st Cir. 2015) (explaining that courts "deem waived claims not made" (quoting *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011))).

[22] That is not to say it is never appropriate for a court to resolve sham litigation allegations on a motion to dismiss.  *See, e.g.*, *Mass. Laborers'*, 783 F. Supp. 3d at 441 (granting motion to dismiss plaintiff's sham litigation claims); *see also generally United Food II*, 902 F.3d 1 (affirming grant of motion to dismiss two putative antitrust class actions where neither the sham litigation nor *Walker Process* exceptions applied to waive *Noerr-Pennington* immunity).

In arguing its entitlement to *Noerr-Pennington* immunity, Alexion emphasizes that the settlement constitutes a "winning lawsuit" under *PRE*, Mem. at 16–18, and that patents are presumed valid, *id.* at 18–19. That the Samsung suit settled on terms favorable to Alexion provides strong evidence that the patent litigation was not objectively baseless.[23]  *See, e.g.*, *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 992 (N.D. Ill. 2003) ("If, however, there is nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation."). However, a settlement alone is not dispositive on the issue of sham litigation at the motion to dismiss stage.  *See, e.g.*, *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 367 (3d Cir. 2020) (stating that "ordinarily, settlement on terms favorable to a plaintiff suggests a suit is not objectively baseless" but that even when it is favorable, it is "not dispositive" about the issue); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.* ("*United Food I*"), 2017 WL 2837002, at *11 (D. Mass. June 30, 2017) (explaining on motion to dismiss that "the fact that [defendant] has obtained settlements involving challenges to the validity of the [patents] and that these patents have never actually been called into question by a judicial authority, while not dispositive, further undercuts Plaintiffs' ability to allege objective baselessness, particularly where Plaintiffs have not called the settlements themselves into question"), *aff'd*, 902 F.3d 1 (1st Cir. 2018).[24]  This is because

---

[23] The Court further recognizes the importance and value of settlements. *See, e.g.*, *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) ("[S]ettlement agreements enjoy great favor with the courts 'as a preferred alternative to costly, time-consuming litigation.'" (quoting *Mathewson Corp. v. Allied Marine Indust., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987))).  But the complete terms of the settlement are not in the record, *see* Compl. ¶ 287 ("No terms of [the Samsung] settlement agreement have been made public."), so the Court is skeptical as to whether it can draw any conclusions as to the favorability of the settlement. *Cf. Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 367 (3d Cir. 2020) (questing favorability of settlement agreement in which the company paid $2 million dollars to the generics and agreed to let generic competitor enter market six years before patent expiration).

[24] The Court notes that the First Circuit's decision did not discuss the underlying suit's settling. *See generally United Food II*, 902 F.3d 1.

"[o]bjective baselessness is assessed at the time of filing," *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 333 F. Supp. 3d 135, 154 (E.D.N.Y. 2018), and there can be reasons for a party to settle aside from the strength of its litigation position, *see AbbVie*, 976 F.3d at 367–68 (including the cost of litigation as an example).  Given the lack of information in the record as to the settlement terms, the Court cannot conclude at this juncture that the settlement *per se* entitles Alexion to *Noerr-Pennington* immunity.

Alexion also argues that patents are generally presumed valid and thus companies are entitled to enforce their rights under their patents.  Mem. at 18–19; *see also United Food II*, 902 F.3d at 14 ("A patent is 'presumed valid' and thus its validity can be challenged only with clear and convincing evidence." (quoting *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011))); *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381, 1386 (Fed. Cir. 1987) ("The allegation by an accused infringer that the patent is invalid—an assertion frequently made by those charged with infringement—cannot be turned into evidence that the patentee knew the patent was invalid when it instituted an infringement suit."); *United Food I*, 2017 WL 2837002, at *11  ("[A] merely plausible patent invalidity claim is not enough to support a plausible sham litigation claim"). "However, where a patent infringement action is brought '"with knowledge the patent is invalid or not infringed, and the litigation is conducted for anticompetitive purposes" [the case] is a "sham" litigation.'"  *La. Health*, 2025 WL 1056668, at *24 (alteration in original) (quoting *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 326 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014)).

But in this case, Emblem alleges more than invalidity on anticipation or obviousness grounds.  *Cf. United Food II*, 902 F.3d at 14–15.  Emblem alleges in the Complaint that: (1) Alexion obtained the 2017 Patents and 2020 Patents through material misrepresentations and

omissions on the PTO;[25] (2) Alexion knew they had obtained the patents through those material misrepresentations and omissions; (3) Alexion had a strong financial incentive to prevent generic entry into the market; (4) Alexion's suit against Samsung sought to "tie[] its competitor up in litigation for the purpose of delaying its biosimilar launch;" and (5) Alexion's suit and resulting settlement had the actual effect of delaying generic entry. This is "sufficient to withstand a motion to dismiss."[26] *See, e.g., In re Prograf Antitrust Litig.*, 2012 WL 293850, at *7 (D. Mass. Feb. 1, 2012); *cf. La. Health*, 2025 WL 1056668, at *26 ("Without sufficiently alleging fraud, no plausible allegations remain suggesting how [defendant's] lawsuits regarding these patents would be objectively baseless").

As such, Emblem has sufficiently pled facts to suggest Alexion knowingly obtained the 2017 Patents and 2020 Patents through material misrepresentations and omissions such that Emblem may be able to demonstrate that "no reasonable litigant could expect to succeed in a lawsuit to enforce an invalid patent." *Garmon Corp. v. Vetnique Labs, LLC*, 2020 WL 3414983, at *5 (N.D. Ill. June 22, 2020). Again, given that the *Noerr-Pennington* doctrine is an affirmative defense, *MJ's Market*, 766 F. Supp. 3d at 213, nothing on the face of the Complaint "forecloses the possibility" that Alexion's suit against Samsung falls within the sham exception, *see Constr. Cost Data*, 2017 WL 2266993, at *6. Accordingly, Emblem may be able to show, consistent with

---

[25] For the purposes of their motion to dismiss, Alexion has not challenged this allegation. *Cf. La. Health*, 2025 WL 1056668, at *24–27 (dismissing sham litigation claims premised on fraud on the PTO after holding "[p]laintiffs have not plausibly alleged fraud as to these patents"). The Court acknowledges that allowing the sham litigation claim to proceed based on allegations of fraud or inequitable conduct seems to raise similar antitrust standing concerns as with *Walker Process* claims. *See* Section III(A)(1)(b), *supra*. But neither party has argued this issue, and thus it is not before the Court. *See MJ's Mkt.*, 766 F. Supp. 3d at 211 (noting that "the lack of antitrust standing does not implicate . . . subject matter jurisdiction" and is thus waivable) (collecting cases).

[26] As further support that these claims are not susceptible to dismissal at this stage, the Court notes that "[q]uestions of knowledge and intent are factual questions for the jury." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407 (Fed. Cir. 2018).

the allegations in the Complaint, that the sham exception applies. The Court will therefore not dismiss Emblem's Sherman Act claims premised on a theory of sham liability.

### B. <u>State Law Claims</u>

The parties agree that the merits of Emblem's various state law claims generally all rise and fall with Emblem's antitrust claims. *See* Opp. at 32 ("[T]he analysis above applies equally to the state law claims."); Reply at 26 ("[S]tate antitrust, consumer protection, and unjust enrichment claims cannot survive where the core federal claims are not viable. As a result, because Emblem's federal claims fail, its state claims fail as well." (citations omitted)). Thus, only Emblem's claims alleging sham litigation survive. *See, e.g.*, *La. Health*, 2025 WL 1056668, at *33 ("Because the Court dismisses the federal antitrust claims . . . Plaintiffs' state law claims [alleging violations of antitrust state law, unjust enrichment, and consumer protection laws]—based on the same factual allegations—fail too.").

## V. <u>Conclusion</u>

For the foregoing reasons, Alexion's motion to dismiss, Dkt. 27, is GRANTED in part. Emblem's claims pursuant to Section 2 of the Sherman Act and analogous state law claims are dismissed to the extent they rely on a *Walker Process* theory to avoid *Noerr-Pennington* immunity, but those claims relying on a sham litigation theory survive.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  December 19, 2025                      Judge, United States District Court