UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **EMBLEMHEALTH, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ALEXION PHARMACEUTICALS, INC. and ALEXION PHARMA INTERNATIONAL OPERATIONS LTD.,**<br><br>**Defendants.** | ) | **Civil Action No. 25-10985-BEM** |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**MURPHY, J.**

Plaintiff EmblemHealth, Inc. ("Emblem") brings this putative class action against Defendants Alexion Pharmaceuticals, Inc. and Alexion Pharma International Operations Ltd. (collectively, "Alexion"), alleging that Alexion engaged in anti-competitive conduct in violation of the Sherman Act by enforcing fraudulently obtained patents for its drug sold under the brand name Soliris. Emblem also brings antitrust, consumer protection, and unjust enrichment claims against Alexion under state law. As a purchaser of Soliris for members of its health plan, Emblem argues that it overpaid for the drug due to Alexion's conduct. For the reasons stated below, the Court will grant Alexion's motion for judgment on the pleadings.

## I. Background

### A. Factual Background

The Court presumes familiarity with the factual background set forth in its prior opinion on Alexion's motion to dismiss, *see EmblemHealth, Inc. v. Alexion Pharms., Inc.* ("*Emblem I*"),

813 F. Supp. 3d 205, 211–214 (D. Mass. 2025), and provides only an abbreviated overview of the facts here. The following facts are drawn from Emblem's amended complaint, Dkt. 22 ("Compl." or the "Complaint"), and are accepted as true for the purposes of resolving Alexion's motion for judgment on the pleadings.

In 2002, Alexion received a patent, U.S. Patent No. 6,355,245 ("the '245 patent"), from the U.S. Patent and Trademark Office ("PTO") for the anti-C5 antibody eculizumab, which it had developed by 1995 and sought to patent, along with other anti-C5 antibodies. Compl. ¶¶ 102, 109–10. In 2007, the FDA approved eculizumab to treat paroxysmal nocturnal hemoglobinuria ("PNH"), and thereafter, Alexion marketed it under the brand name "Soliris." *Id.* ¶¶ 2, 133. The '245 patent protected eculizumab for 17 years, until March 12, 2019.[1] *Id.* ¶ 113. Between 2016 and 2020, Alexion obtained three 2017 patents and two 2020 patents: U.S. Patent No. 9,718,880 ("the '880 patent"), U.S. Patent No. 9,725,504 ("the '504 patent"), and U.S. Patent No. 9,732,149 ("the '149 patent") (together with the '880 patent and the '504 patent,, "the 2017 Patents"); U.S. Patent No. 10,590,189 ("the '189 patent")[2] and U.S. Patent No. 10,703,809 ("the '809 patent," together with the '189 patent, "the 2020 Patents"). *Id.* ¶¶ 172, 174–75, 194–97, 222–23, 228. After initially rejecting the applications for each of these patents, the patent examiner at the PTO later allowed them, following the receipt of additional information from Alexion and its patent attorney that allegedly contained misrepresentations and incomplete disclosures. *Id.* ¶¶ 173, 176–92, 194–97, 210–41. The 2017 and 2020 Patents are set to expire between March 15, 2027, and September 8, 2027. *Id.* ¶ 170.

---

[1] In 2007, Alexion sought additional patent protections for eculizumab for the treatment of PNH, and received a two-year extension of its '245 patent to March 16, 2021. Compl. ¶¶ 134–35, 145.

[2] The patent number for the '189 patent is not referenced in the Complaint, but Alexion refers to it as U.S. Patent No. 10,590,189. Dkt. 81 at 7 n.2.

By November 2018, Samsung Bioepsis ("Samsung") began clinical trials of its own eculizumab biosimilar drug. *Id.* ¶ 200. Biosimilar drugs are based on copies of existing biologic drugs, and have "no clinically meaningful differences in safety, purity, or potency as compared to their reference biologics," even though they are not identical to their reference biologics. *Id.* ¶¶ 30–32. Under the Biologics Price Competition and Innovation Act ("BPCIA"), 42 U.S.C. § 262(k)(7), a biosimilar manufacturer may not submit an application for approval of its biosimilar to the FDA until four years after the reference product is first licensed, and the application may not be approved until twelve years after the reference product is first licensed, Compl. ¶¶ 29–33. A biosimilar manufacturer submitting such an application must provide the patent holder at least 180 days of notice before commercially marketing its biosimilar. *Id.* ¶ 67; *see* 42 U.S.C. § 262(l)(8)(A). After that notice period expires, and upon FDA approval, the applicant may launch the biosimilar, even if there is unresolved patent litigation, so long as the applicant accepts the risk of paying damages if the patents are found valid, enforceable, and infringed. Compl. ¶ 68.

In June 2023, Samsung challenged the 2017 and 2020 Patents via *inter partes* review ("IPR"), in which a panel of administrative law judges belonging to the Patent Trial and Appeals Board ("PTAB") reviews the patent at issue. *Id.* ¶¶ 54–55, 257. In December 2023, the PTAB instituted review of the patents, finding that Samsung demonstrated a reasonable likelihood of prevailing on at least one of its invalidity arguments for each patent. *Id.* ¶¶ 257–62. Briefing for the IPR proceedings was set to conclude by summer 2024, and oral arguments were scheduled for September 17, 2024. *Id.* ¶¶ 263, 285.

In July 2023, Samsung applied for approval of its Soliris biosimilar with the FDA, and notified Alexion that it intended to launch the biosimilar after January 3, 2024, following the BPCIA-mandated 180-day waiting period. *Id.* ¶¶ 264–65. Samsung received FDA approval on

July 19, 2024. *Id.* ¶ 284. On January 3, 2024, Alexion filed a patent infringement lawsuit against Samsung. *Id.* ¶ 266. Alexion's request for an injunction or temporary restraining order in that lawsuit was denied, and the parties settled on August 30, 2024. *Id.* ¶¶ 279–80, 283, 286. The settlement included dismissal of all pending claims involving Soliris, including the patent litigation and all pending IPR proceedings. *Id.* ¶ 286. Samsung launched its Soliris biosimilar in April 2025. *Id.* ¶¶ 170, 289.[3]

Emblem is a health insurer that purchases Soliris for its members through third-party pharmacies. *Id.* ¶¶ 11–13. Emblem alleges that it, and other end payers like it, have been forced to pay higher prices for Soliris because Alexion unlawfully prevented biosimilars, like Samsung's biosimilar, from entering the market since at least March 2022. *Id.* ¶¶ 288–89, 291–92.

### B. <u>Procedural Background</u>

On April 16, 2025, Emblem filed its initial complaint alleging various antitrust violations by Alexion. Dkt. 1. On June 24, 2025, Emblem filed an amended complaint, asserting claims for monopolization and monopolistic scheme under Section 2 of the Sherman Act and state law (Counts 1 and 3), Compl. ¶¶ 355–69, 380–98; attempted monopolization under Section 2 of the Sherman Act and state law (Counts 2 and 4), *id.* ¶¶ 370–79, 399–416; violations of state consumer protection laws (Count 5), *id.* ¶¶ 417–658; and unjust enrichment (Count 6), *id.* ¶¶ 659–882. On August 5, 2025, Alexion moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims against it. Dkts. 27–28. On December 19, 2025, the Court granted the motion in part, dismissing claims pursuant to Section 2 of the Sherman Act and analogous state law claims

[3] Amgen, another biosimilar manufacturer developing an eculizumab biosimilar, also challenged Alexion's 2017 Patents via IPR. Compl. ¶¶ 164–65, 207. The PTAB instituted review of the patents, and Amgen and Alexion settled the proceedings prior to a final determination by the PTAB. *Id.* ¶¶ 208, 246. The settlement required Amgen to delay marketing of its product until March 1, 2025, and after obtaining FDA approval, Amgen launched its biosimilar in March 2025. *Id.* ¶¶ 84, 247, 283, 288.

to the extent that they rely on a *Walker Process* theory to avoid *Noerr-Pennington* immunity, but allowing those claims relying on a sham litigation theory to survive. *Emblem I*, 813 F. Supp. 3d at 224.

On January 18, 2026, Emblem moved for reconsideration of the order on Alexion's motion to dismiss, Dkt. 57, and asked the Court to reconsider "its ruling that end payers lack standing to bring state law antitrust claims that included *Walker Process* allegations," Dkt. 58 at 6. The Court denied the motion on March 18, 2026. Dkt. 65. On April 8, 2026, Emblem also moved to certify the Court's order on Alexion's motion to dismiss for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Dkts. 67–68. The Court denied that motion. Dkt. 71. On September 11, 2026, Alexion moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Dkt. 80; *see* Dkt. 81 ("Mem."). The Court held a hearing on October 23, 2026, and took the motion under advisement. Dkt. 90.

## II. <u>Legal Standard</u>

"The standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure is the same as that for a motion to dismiss under Rule 12(b)(6)." *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 5 (1st Cir. 2007). Therefore, the Court must determine whether a plaintiff's factual allegations—disregarding all "conclusory" statements—"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (describing standard under Rule 12(b)(6)). At the pleading stage, plaintiffs need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *García-Catalán v. United States*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion, we may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim;

[and] documents sufficiently referred to in the complaint.'" *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (quoting *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993) (alterations in original).

## III. Discussion

Emblem brings antitrust claims against Alexion, alleging that it violated Section 2 of the Sherman Act ("Section 2") through unlawful monopolization and attempted unlawful monopolization. Compl. ¶¶ 355–79. Under the *Noerr-Pennington* immunity doctrine, "[a] party petitioning the government for redress," including a party enforcing its intellectual property rights, "is 'generally immune from antitrust liability.'"[4] *Iron Workers Dist. Council of New England Health & Welfare Fund v. Teva Pharm. Indus. Ltd.* ("*Iron Workers I*"), 734 F. Supp. 3d 145, 159 (D. Mass. 2024) (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 56 (1993)); *see United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.* ("*United Food II*"), 902 F.3d 1, 4–5 (1st Cir. 2018) ("[T]he petitioning activity within this doctrine's protection includes enforcing one's intellectual property rights in court.").

"An antitrust defendant may not enjoy the [*Noerr-Pennington*] immunity in enforcing its patent if it [1] obtained that patent through a fraud on the Patent Office, or [2] if its suit to enforce the patent is a 'sham' for impermissible anti-competitive conduct." *United Food II*, 902 F.3d at 5. The first exception to *Noerr-Pennington* immunity is referred to as the *Walker Process* exception, originating from the Supreme Court's ruling in *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965), where the court stated that "the enforcement of a patent

[4] The doctrine originates from the Supreme Court's rulings in *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) and *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961). The doctrine "can apply to certain state law claims as well as federal claims." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, 2017 WL 2837002, at *9 (D. Mass. June 30, 2017), *aff'd*, 902 F.3d 1 (1st Cir. 2018).

procured by fraud on the Patent Office may be violative of [federal antitrust law] provided the other elements necessary to a[n] [antitrust] case are present." *Walker Process*, 382 U.S. at 174. The second exception is referred to as the "sham litigation" exception. A plaintiff must plausibly allege that either exception applies to state a claim. *See United Food II*, 902 F.3d at 5.

Alexion asserts immunity against Emblem's antitrust claims under the *Noerr-Pennington* doctrine, Mem. at 15, but Emblem contends that Alexion's patent litigation against Samsung was "sham litigation," unprotected by *Noerr-Pennington*, Dkt. 83 ("Opp.") at 23. "Sham litigation" is litigation that (1) is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "conceals 'an attempt to interfere *directly* with the business relationships of a competitor' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *United Food II*, 902 F.3d at 13 (alteration in original) (emphasis in original) (internal citation omitted).

Alexion moves for judgment on the pleadings on two grounds: (1) that Emblem's "sham litigation" arguments are foreclosed by this Court's prior ruling on standing, Mem. at 11–15, and (2) that Alexion's settlement with Samsung precludes Emblem from plausibly alleging that Alexion engaged in "sham litigation," *id.* at 15–19. The Court addresses each argument in turn below.

### A. Sham Litigation Standing

To assess whether a plaintiff has antitrust standing, the First Circuit, following the Supreme Court's ruling in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537–45 (1983) ("*AGC*"), employs a six-factor test:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the

> speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 14 (1st Cir. 2001) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)). This Court previously held in its prior opinion on Alexion's motion to dismiss that Emblem could not assert a *Walker Process* claim, which constitutes another means of overcoming *Noerr-Pennington* protection, because it lacked antitrust standing. *See Emblem I*, 813 F. Supp. 3d at 219–21. The Court concluded that Emblem's status as an "indirect purchaser" of a patented product precluded it from asserting the claim, because "[t]he alleged fraud on the PTO is too far removed from Emblem's injuries, with too many intervening intermediaries." *Id.* at 220. The Court "acknowledge[d] that allowing the sham litigation claim to proceed based on allegations of fraud or inequitable conduct seems to raise similar antitrust standing concerns as with *Walker Process* claims," but did not rule on antitrust standing with respect to the sham litigation claim because "neither party has argued this issue." *Id.* at 223 n.25.

Alexion argues that the sham litigation claim is "entirely coextensive with the same alleged fraud theory that this Court already held Emblem lacks the standing to pursue," and therefore should be dismissed for lack of antitrust standing. Mem. at 13. Emblem argues that (1) antitrust standing for its "state law claims must be analyzed under state law"; (2) "indirect purchasers are the most efficient enforcers of antitrust law—particularly as to state law antitrust claims"; and (3) Emblem has standing even in states that use a modified version of the federal standing test from *AGC*, because it is an efficient enforcer of antitrust law. Opp. at 14. Emblem brings state law antitrust claims under the laws of twenty-nine states. *See* Compl. ¶¶ 397, 415.

Emblem's arguments that it satisfies the federal antitrust standing test because it is an efficient enforcer of antitrust law, or satisfies the antitrust standing test in states that model their

standing test after the federal test set forth in *AGC*, *see* Dkt. 83 at 18–22, are foreclosed by this Court's previous decision. The Court ruled that the "alleged fraud on the PTO is too far removed from Emblem's injuries, with too many intervening intermediaries" for Emblem to have federal antitrust standing. *Emblem I*, 813 F. Supp. 3d at 220. Alexion argues—and Emblem does not contest—that the sham litigation allegations also rely on the same theory of fraud on the PTO. *See* Mem. at 12. This Court previously described Emblem as pleading sham litigation based on allegations that "Alexion knowingly obtained the 2017 Patents and 2020 Patents through material misrepresentations and omissions such that Emblem may be able to demonstrate that 'no reasonable litigant could expect to succeed in a lawsuit to enforce an invalid patent.'" *Emblem I*, 813 F. Supp. 3d at 224 (quoting *Garmon Corp. v. Vetnique Labs, LLC*, 2020 WL 3414983, at *5 (N.D. Ill. June 22, 2020)). In other words, Emblem's sham litigation is premised on a fraud on the PTO. *Cf. La. Health Serv. & Indem. Co. v. Celgene Corp.*, 2025 WL 1056668, at *26 (S.D.N.Y. Apr. 8, 2025) ("Plaintiffs have not plausibly alleged fraud as to these patents. Without sufficiently alleging fraud, no plausible allegations remain suggesting how Celgene's lawsuits regarding these patents would be objectively baseless."). Having fully considered the issue after briefing here, the Court concludes that Emblem has no antitrust standing under federal law, or under state law in states that employ a test similar to the federal test set forth by *AGC*. While Plaintiffs renew their arguments that Emblem, an end payor and indirect purchaser of pharmaceuticals, satisfies the *AGC* standing factors and is an efficient enforcer of antitrust laws, Opp. at 18–22, the Court will not depart from its prior conclusion here, *see Emblem I*, 813 F. Supp. 3d at 219–20.

As to the states with standards for antitrust standing that diverge from the federal standard, the analysis is dependent on the specifics of each state's laws.[5] "[A]ntitrust standing to recover under state antitrust statutes in federal court is a question of state law." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.* ("*United Food I*"), 2017 WL 2837002, at *10 n.10 (D. Mass. June 30, 2017), *aff'd*, 902 F.3d 1 (1st Cir. 2018). A state-by-state analysis would be required to determine which states grant indirect purchasers the right to sue for antitrust violations. *See Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms., Inc.,* 783 F. Supp. 3d 417, 443–50 (D. Mass. 2025) (undertaking a state-by-state analysis); *In re Amitiza Antitrust Litig.*, 2024 WL 4250224, at *11–15 (D. Mass. Aug. 21, 2024) (similar), *report and recommendation adopted as modified*, 2024 WL 4344887 (D. Mass. Sept. 30, 2024). "While some states have passed laws known as '*Illinois Brick*-repealers' which expressly grant [indirect purchasers] the right to sue for antitrust violations, '[indirect purchasers] cannot assert antitrust claims under the law of states which have not passed such laws.'" *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *15 (D. Mass. Sept. 16, 2015) (quoting *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 409 (D. Mass. 2013)); *see also* William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 20:12 (6th ed. 2026) ("26 states and the District of Columbia have judicially or legislatively 'repealed'

[5] In their briefing on the prior motion to dismiss, "[t]he parties agree[d] that the merits of Emblem's various state law claims generally all rise and fall with Emblem's antitrust claims." *Emblem I*, 813 F. Supp. 3d at 224. However, Emblem argues that it "did not concede (and Alexion did not argue) that the standing analysis was identical under federal and state law." Opp. at 13 n.9. Emblem also "acknowledges that the arguments it makes here apply to Emblem's standing to assert exceptions to Alexion's defenses, even those the Court rejected." *Id.* at 7 n.1. The Court continues to recognize that the sham litigation claim "seems to raise similar antitrust standing concerns" as the *Walker Process* claim. *Emblem I*, 813 F. Supp. 3d at 223 n.25. However, the Court has already denied Emblem's motion to reconsider dismissal of the *Walker Process* claims based on Emblem's alleged antitrust standing under state law. Dkt. 65 ("Plaintiffs expressly declined to make separate arguments for their state law claims."). Accordingly, the Court will not revisit its prior conclusion that Emblem's federal *and* state antitrust claims relying upon the *Walker Process* exception to *Noerr-Pennington* immunity are dismissed.

*Illinois Brick* and provided standing to indirect purchasers under state antitrust or consumer protection statutes.").[6]

Neither party identifies which of the twenty-nine state antitrust laws under which Emblem brings a claim grant indirect purchasers antitrust standing.[7] However, Emblem notes that certain "states have deliberately granted indirect purchasers with standing to bring such claims." Opp. at 14. Emblem has also provided at least one example of a court declining to apply the *AGC* factors and holding that an indirect purchaser had antitrust standing under state law. *See Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007) ("[W]e believe application of the *AGC* factors in Minnesota would contravene the plain language of the statute and in some cases thwart the intent of the legislature by barring indirect purchaser suits.").[8] Therefore, the Court will assume, without deciding, that Emblem has antitrust standing to assert its sham litigation claim in states that do not use the *AGC* test to determine standing, and decide the case on the merits of the

---

[6] "In *Illinois Brick,* the Supreme Court held that indirect purchasers of goods produced by firms engaged in anticompetitive conduct were too remote from that conduct to be regarded as injured within the meaning of the Clayton Act." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d at 409 (citing *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746–48 (1977)).

[7] Even state laws that allow indirect purchasers to have antitrust standing do not necessarily extend standing to all indirect purchasers and would not necessarily extend standing to Emblem here. *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *16 (N.D. Ill. June 29, 2015) ("[T]he Court does not hold that Direct Purchasers are necessarily the only actors in the causal chain who have antitrust standing to sue; rather, the Court holds only that Indirect Plaintiffs' injuries are too remote and speculative to afford them antitrust standing" under California, Kansas, Michigan, New York, and North Carolina law); *Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489, 497–98 (2006) ("The 2002 amendment . . . simply removed the automatic bar against indirect purchaser actions . . . . It did not eliminate separate and distinct antitrust standing requirements that bar appellants' claims."). Therefore, this Court's prior ruling that Emblem has no antitrust standing to bring its *Walker Process* claims does not necessarily "undermine" or conflict with "those states that have allowed indirect purchasers to generally pursue federal antitrust damages claims." *Emblem I*, 813 F. Supp. 3d at 220 n.17.

[8] Even in *Lorix*, the court acknowledged that "[t]he fact that the district court and court of appeals erred in applying *AGC* and imposing a market-participant requirement does not necessarily mean that [the indirect purchaser] has standing. The real difficulty lies in defining the outer limits of indirect purchaser standing in Minnesota." *Lorix*, 736 N.W.2d at 630.

sham litigation claim.[9] *See United States v. Catala*, 870 F.3d 6, 10 (1st Cir. 2017) ("Unlike Article III standing, though, the existence of statutory standing is not a prerequisite to a court's power to adjudicate a case. Thus, an inquiring court may opt, in the interest of efficiency, to forgo an inquiry into statutory standing and reject a claim on the merits." (citation omitted)).

### B. Sham Litigation Merits

To prevail on the claim that Alexion's patent infringement suit against Samsung was "sham litigation," Emblem must allege that the suit was (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "conceals 'an attempt to interfere directly with the business relationships of a competitor' through the 'use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'" *United Food II*, 902 F.3d at 13 (emphasis in original) (citation omitted).

Alexion contests only the first prong in its motion for judgment on the pleadings,[10] on the basis that Alexion's settlement with Samsung constitutes a favorable outcome that proves that the litigation was not objectively baseless. *See* Mem. at 15–19. In opposition, Emblem does not characterize the terms of the settlement agreement itself, arguing that "[w]hether the terms of Alexion's settlement agreements are favorable to Alexion is irrelevant." Opp. at 24. Emblem claims that there are reasons a party might settle beyond the strength of its litigation position, and that pharmaceutical competitors are individually incentivized to settle to ensure entry of their products, instead of advocating for all products. *Id.* Emblem further argues that "Alexion settled its claims because it knew its patents were fraudulent and that they would likely be invalidated by

[9] Because the Court decides the sham litigation claim on its merits, it does not address Emblem's additional argument that it has antitrust standing to assert its injunctive relief claims under the Clayton Act. *See* Opp. at 22–23.

[10] As the Court previously noted, Alexion waived arguments that "Emblem has failed to adequately plead the second prong." *Emblem I*, 813 F. Supp. 3d at 221 n.21.

either the PTAB or the district court." *Id.* at 24–25. Emblem argues that this creates a fact dispute regarding the motivations for the settlement, which is enough to sustain its allegations beyond the pleading stage. *Id.* at 25.

In its ruling on Emblem's prior motion to dismiss, the Court noted that "the Samsung suit settled on terms favorable to Alexion provides strong evidence that the patent litigation was not objectively baseless," but that "a settlement alone is not dispositive on the issue of sham litigation at the motion to dismiss stage." *Emblem I*, 813 F. Supp. 3d at 222–23. The Court denied the motion to dismiss as to the sham litigation claim, explaining that "[g]iven the lack of information in the record as to the settlement terms, the Court cannot conclude at this juncture that the settlement *per se* entitles Alexion to *Noerr-Pennington* immunity." *Id.* at 223.

On its motion for judgment on the pleadings, Alexion attaches the settlement agreement, *see generally* Dkt. 82-1, which is referenced in Emblem's complaint, Dkt. 1 ¶¶ 285–287. Emblem does not dispute the authenticity of the settlement agreement provided by Alexion, or argue that it cannot be considered, so the Court will consider it here. *See Curran*, 509 F.3d at 44 ("In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion, we may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'" (quoting *Watterson v. Page,* 987 F.2d at 3 (alterations in original)).

As before, the Court agrees that a settlement alone is not dispositive on the issue of sham litigation but finds a favorable settlement agreement to be strong evidence that litigation was not objectively baseless. *See Mass. Laborers*, 783 F. Supp. 3d at 441 ("These terms are favorable . . . and, at a minimum, as such suggest that the infringement suits are not objectively baseless."); *Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 367 (3d Cir. 2020) ("[O]rdinarily, settlement on terms

favorable to a plaintiff suggests a suit is not objectively baseless."); *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 338 (S.D.N.Y. 2019) ("Various courts . . . have reached this conclusion in the context of settlement, holding that settlement of a purportedly objectively baseless lawsuit constitutes a favorable outcome within the meaning of *Noerr-Pennington* and therefore insulates the activity from application of the sham exception.") (collecting cases).[11] The Court previously indicated that it could not "draw any conclusions as to the favorability of the settlement," *Emblem I*, 813 F. Supp. 3d at 222 n.23, because of "the lack of information in the record as to the settlement terms," *id.* at 223. Now that the settlement terms can be considered, the Court undertakes an analysis of whether the settlement terms are favorable.

The settlement agreement comports with Alexion's characterization that "Samsung agreed to dismiss its challenge to the validity of Alexion's 2017 and 2020 Patents before the PTAB, and Samsung agreed to dismiss its inequitable conduct counterclaim against Alexion as to those same patents." Mem. at 18; *see generally* Dkt. 82-1. The settlement does not contain a "large and unjustified" reverse payment to the alleged infringer that "can bring with it the risk of significant anticompetitive effects." *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 158 (2013); *see also La. Health Serv. & Indem. Co.*, 2025 WL 1056668, at *25 ("Plaintiffs have not plausibly alleged that the settlements were fraudulent, *i.e.*, that they contained unlawful reverse payments.").

---

[11] Emblem claims in its opposition that "[n]umerous generic delay antitrust cases alleging sham theories have survived a motion to dismiss where the underlying patent litigation resulted in a settlement." Dkt. 83 at 23. However, the cases it relies upon do not specifically consider whether a favorable settlement agreement constitutes proof that litigation was not objectively baseless. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 273 (3d Cir. 2017) (concluding that defendant's submission of a "citizen petition to the FDA" was not proof of objectively baseless sham litigation because "allegations plausibly allege [defendant] submitted a sham petition not supported by science"); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 333 F. Supp. 3d 135, 154–55 (E.D.N.Y. 2018) (similarly considering whether the FDA's responses to citizen petition can be dispositive of objective baselessness); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 348 (D.R.I. 2017) (finding that "Plaintiffs have stated a plausible claim for sham litigation," not based on any evaluation of a settlement agreement, but because "Plaintiffs have alleged facts sufficient to conclude that" defendant has "actual knowledge that" the patent "was fraudulently procured").

While case law provides no bright-line rule on what constitutes a favorable settlement in the patent context, the settlement between Alexion and Emblem lacks some of the indicia that led the Third Circuit to label the settlement in *AbbVie* "not especially favorable." 976 F.3d at 367. Here, unlike in *AbbVie*, Alexion did not make a payment of "reasonable litigation expenses" to Samsung. *Id.* Moreover, Alexion argues that it "successfully enforced its patent rights because Samsung did not launch its Soliris biosimilar until April 2025 pursuant to the resolution of the patent issues in the IPRs and the District of Delaware litigation," and "achieved the objectives of the litigation by enforcing its patent rights to prevent Samsung's immediate launch of its Soliris biosimilar." Mem. at 18. Absent any rebuttal from Emblem as to its characterization of the settlement terms, the Court is inclined to treat the outcomes obtained as favorable to Alexion.

Emblem's argument that a party may "abandon[] otherwise meritorious patent claims to settle an infringement suit" for reasons "often found outside the four corners of the parties' agreement," Opp. at 24, offers little more than conjecture.[12] The Court is cognizant of the fact that the Emblem has not completed discovery and developed a record, and the Court must decide based on the pleadings here. However, Emblem cannot sustain its claim in the wake of evidence of a favorable settlement with only generic allegations that Alexion settled to delay competition and that competitors face settlement incentives to secure their own market entry. *See* Compl. ¶ 81 ("[A] would-be competitor would prefer to gain market entry for its *own* product only rather than open the market for *all* would-be competitors." (emphasis in original)). That would essentially allow any sham litigation claim deriving from a patent lawsuit filed by a pharmaceutical company

[12] It remains true that "even if [a] settlement was favorable . . . that is not dispositive," *AbbVie*, 976 F.3d at 367, but a favorable settlement is strong evidence that cannot be defeated with only speculation. In *AbbVie*, evidence suggested that the competitor did not settle because it "doubted its litigation position." *Id.* at 368. For example, the assistant general counsel of Abbvie's competitor had estimated prior to settling with Abbvie that they had a seventy-five percent chance of victory. *Id.*

to move past the pleading stage, no matter how favorable the terms of a settlement. *See, e.g.*, *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 992 (N.D. Ill. 2003) ("If, however, there is nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation.").

Because the Court finds that Emblem has not plausibly pled that Alexion's litigation against Samsung was a "sham," Alexion is entitled to *Noerr-Pennington* immunity against Emblem's federal antitrust claims and analogous claims under state law.[13] The Court will accordingly grant judgment on the pleadings as to the remaining claims in the lawsuit.

## IV. Conclusion

For the foregoing reasons, Alexion's motion for judgment on the pleadings is GRANTED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: November 16, 2026

[13] The Court previously noted that "Emblem does not allege a sham litigation exception as to Alexion's conduct in defending the IPR process initiated by Amgen." *Emblem I*, 813 F. Supp. 3d at 221 n.20. To the extent that Emblem attempts to allege a sham litigation claim here with respect to Alexion's patent dispute and subsequent settlement with Amgen, that claim is foreclosed for substantially the same reasons as the sham litigation claim with respect to the Samsung lawsuit. *See generally* Dkt. 82-2 (providing Alexion's settlement with Amgen).